Filed 10/1/14  P. v. James CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B254611 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA099220) |
| v. | |
| MARQUIS WAYNE JAMES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Richard B. Lennon, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Marquis Wayne James appeals from the judgment entered following his plea of nolo contendere to 10 counts of second degree robbery (Pen. Code, § 211)[1] and one count of attempted second degree robbery (§§ 664, 211), during each of which he personally used a handgun (§ 12022.53, subd. (b)) and a principal was armed with a handgun (§ 12022, subd. (a)(1)), and his admissions he committed the offenses while released from custody on bail (§ 12022.1) and after he had suffered convictions for three offenses for which he served prison terms pursuant to section 667.5, subdivision (b). The trial court sentenced James to a total term of 40 years 4 months in state prison.[2] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*[3]

On August 6, 2012, Lindsey Montgomery[4] was the manager of a McDonald's restaurant in Pomona. When she arrived at the restaurant at approximately 4:00 o'clock that morning, Montgomery was approached by two African-American men wearing baseball caps, "black rag[s] over their face[s]" and gloves. At least one of the men was carrying a handgun. The man with the gun told Montgomery to open the store, take the men to the safe and open it. When Montgomery became nervous and had difficulty opening one of the two safes in the store, the man with the gun held it up to her head and told her she had 10 seconds to open the safe "or he would kill [her]." Montgomery was

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     The trial court sentenced James at the same proceedings for his convictions of robbery and attempted robbery, as well as his conviction for being a felon in possession of a firearm (§ 29800, subd. (a)), the offense for which he had been released on bail when he committed the robberies and attempted robbery.

[3]     Since James entered pleas of nolo contendere to the offenses, the statement of facts has been taken from the transcript of the preliminary hearing held with regard to the alleged robberies and attempted robbery.

[4]     When the witness was asked to spell her name she indicated it was "M-o-n-g-o-m-e-r-y." However, in the transcript of proceedings it is spelled "M-o-n-t-g-o-m-e-r-y."

able to open both safes and, after one of the men grabbed a bag from the store, the men took the money from the safes, placed it in the bag, told Montgomery, who was sitting on the floor with her head down, to count to 100, then left the store. Montgomery counted to 10, then pushed the "panic buttons" and telephoned her store supervisor. Montgomery made the call from the store phone because her cellular telephone was missing. Montgomery later identified her phone when it was shown to her by a police officer.

At approximately 8:00 p.m. on August 20, 2012, Adriana Garay was working as the cashier at the Juan Pollo restaurant in Pomona. Two African-American men wearing bandanas, black hats and black shirts came into the restaurant and, although Garay was not standing by the register at the time, the men approached her. One of the men placed a gun next to Garay's back and walked her to the cash register. Garay opened the register and while one man was taking the money out of the drawer, she realized the other man was holding at gun point two of her coworkers, Gabriela Salvador and Adullman Vasquez. Both employees were on their knees. Garay then looked out the restaurant window and saw Salvador's mother pull up in a car. Garay, afraid someone was going to get hurt, asked the men to leave.

When one of the robbers then kicked Salvador, who was pregnant, in the left side, Garay believed the robbers were beginning to panic and she began to scream, telling the men to "just please leave." Salvador, who was still on her knees, directed the men to the back door. The men followed her directions and left the restaurant.

On August 24, 2012, Nicholas Pro, his girlfriend, Brittney Chavez, and his grandparents, Helen Canedo and Fernando Canedo, were having dinner at the Las Margaritas restaurant in Pomona. While Pro and his guests were eating their meal, three men with dark eyes and dark skinned arms, each of whom had his face covered with a bandana, entered the restaurant. One man, who was carrying a rifle, approached Pro's table and told Pro and the others to "[j]ust behave." While Pro watched one of the other two men approach the counter where the cashier was standing and the other man walk into the kitchen, the man with the rifle told Pro and the others at the table to empty their pockets. Pro complied with the demand and placed his wallet and car keys on the table.

3

Pro's grandfather took the money from his pocket and placed it on the table and his wife, Helen, placed her purse on the table. After the man with the rifle took Pro's cell phone, his grandfather's money and the cash from his grandmother's purse, he left the dining room.

At about the same time Pro and his family were eating their dinner, Pedro Sandro was working in the kitchen of the Las Margaritas restaurant. When someone hit him on the back of the head, Sandro turned around and saw an African-American man wearing a hat and a rag covering his face. The man placed a gun against Sandro's head and told Sandro and another man who was present, the dishwasher, Severo Morales, to lie down on the ground, face down. Once Morales was lying on the floor, the man kicked him on his left side, then took from his pocket Morales's money and the keys to the restaurant.

The man with the gun then approached Sandro and, after Sandro gave the man his wallet, the man had Sandro get up and open the cash register at the take-out window in the kitchen. The man took the money from the drawer, then told Sandro to lie back down on the ground and place both his hands behind his head. A second African-American man, whose face was also covered, then brought a third restaurant employee, a waitress, Maribel Serrano, into the kitchen. After one of the two men pulled off Serrano's apron, he threw her onto the ground.

Serrano, who usually worked as a waitress, had been working at the cash register in the restaurant when two men, their faces covered with "handkerchiefs," approached her. While one man walked around behind her, the other man stood in front of Serrano, aimed a gun at her and told her to open the register. After Serrano did so, the man reached into the drawer and took the money. While the second man then headed toward the kitchen, the man with the gun asked Serrano if she knew where the safe was. When Serrano told the man she did not, he grabbed her by her clothing and escorted her to the warehouse. When she still insisted she did not know where the safe was, the man took from a pocket in her apron her wallet, which contained her driver's license, money and her bank card, then took her into the kitchen, threw her down onto the floor and asked her "who would know about the safe." Serrano again told the man she did not know. A third

4

African-American man, whose face was also covered and who was carrying a rifle and wearing a long coat, then came into the kitchen. When the man with the rifle indicated it was time to "go," the three men left the restaurant.

Pomona Police Department Detective Greg Freeman had been the officer assigned to investigate the series of robberies. After Freeman reviewed the video tape from each of the restaurants, he received information that appellant, James, had been involved in each of them. When the detective contacted James on August 29, 2012, he was wearing a baseball cap just like the one in the video tapes of the robbers taken at each of the restaurants. Freeman then went to the apartment of one of James's accomplices and found Montgomery's cell phone. James, however, indicated the phone belonged to him.

When Freeman interviewed James's girlfriend, Kiera Thomas, Thomas told the detective that James and his cohorts had planned the robberies approximately a week before they occurred and, during the robberies, had taken approximately $25,000. James had given Thomas approximately $2,000 to "hold at her apartment" in case he was arrested and needed money for bail.

James was taken into custody on August 29, 2012. After having been advised on his *Miranda*[5] rights, he admitted having taken part in the August 6 robbery of the McDonald's restaurant. Although he denied having been involved in the robberies of the other two restaurants, recordings of telephone calls made from jail to his girlfriend indicated he believed he knew who had "told on him" and he had been "dumb for wearing the [same] hat [to] all three robberies."

2. *Procedural history.*

In an information filed November 26, 2012, James was charged with 10 counts of robbery (§ 211) and one count of attempted robbery (§§ 664, 211), during each of which he was personally armed with a firearm (§12022.53, subd. (b)) and a principal was armed with a firearm (§ 12022, subd. (a)(1)). It was further alleged he had committed the

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436.

offenses after having been released on bail (§ 12022.1) and had served prison terms for three prior convictions within the meaning of section 667.5, subdivision (b).

On January 23, 2013, James asked the trial court for a *Marsden*[6] hearing. James indicated he had asked his counsel to make a section 995 motion to have the information set aside and a motion for discovery of the tape recordings of the robberies. He asserted counsel had failed to act on either of his requests. James stated his counsel had responded to his requests by advising him to " 'just take the 30 years' " being offered by the People.

The trial court noted that, on August 7, 2012, James had been taken into custody for being a felon in possession of a firearm and ammunition. A plea had been taken in the matter on August 20, 2012. James had been released on bail and sentencing had been set for September 10, 2012. However, in the interim, James had been "picked up" the alleged robberies and attempted robbery. With the assistance of defense counsel, the trial court determined James's exposure with regard to both cases (the possession of a firearm, to which he had pled "open," and the robberies and attempted robbery) amounted to approximately 75 years in prison. Defense counsel then informed the trial court that, during her negotiations with the prosecutor, he had indicated he would go no lower than 30 years in prison because, while James's case for possession of a firearm was pending, he allegedly committed numerous violent offenses. It had been alleged James had committed 10 robberies and an attempted robbery, each of which involved the personal use of a firearm.

Defense counsel then addressed the trial court and indicated she had met and discussed with James the police reports and some of the evidence recovered by police officers. In particular, she had told James about the tape recordings of telephone calls he had made to his girlfriend from jail and indicated to him they were especially "incriminating." With regard to James's request that counsel make a section 995 motion, counsel indicated she had not yet decided whether to proceed. As to James's request for

---

**6**      *People v. Marsden* (1970) 2 Cal.3d 118.

discovery, counsel stated she did not need to make such a motion as the prosecutor had already provided her access to the requested evidence.

Defense counsel indicated, since James had informed her that he did not wish to accept the People's offer of 30 years, she would take the case to trial. However, by doing so, James would be "exposing himself to all 11 counts rather than a plea disposition where most of the counts would be dismissed." Counsel continued, "And he's exposing himself to a significant period of time in state prison." "I've given [James] my assessment of the case."

After defense counsel informed the trial court of the evidence the People could present against James at trial, the court concluded counsel was familiar with and had "worked hard to assess the strength of the case." The trial court did not view James's and his counsel's discussions regarding the potential disposition of his case as a "breakdown" in their relationship such that counsel could not continue to "diligently . . . represent" James. The trial court indicated, although it could understand James's frustration with his case, it did not believe his counsel had "failed [in any way] to comply with her professional obligations and responsibilities." Accordingly, the court denied James's motion.

At proceedings held on August 28, 2013, James decided to enter an "open" plea. After waiving his right to a trial, to confront and cross-examine the witnesses against him, his right to produce evidence and present a defense and his right to remain silent, James pled nolo contendere to 10 counts of second degree robbery (§ 211) and one count of attempted second degree robbery (§§ 664, 211), during each of which he personally used a handgun (§ 12022.53, subd. (b)) and a principal was armed with a handgun (§ 12022, subd. (a)(1)). In addition, he admitted having committed the offenses while released from custody on bail (§ 12022.1) and after having suffered three convictions for which he had served prison terms within the meaning of section 667.5, subdivision (b).

On December 10, 2013, the trial court sentenced James. As to the robberies and attempted robbery, the court chose the robbery alleged in count 2 as the base term and imposed the midterm of three years in state prison. For the robberies alleged in counts 1,

7

3, 5, 7 and 10, the court imposed consecutive terms of the low-term of one year as to each count. For the robberies alleged in counts 4, 6, 8 and 9, the trial court sentenced James to concurrent terms of the midterm of three years for each count and for the attempted robbery alleged in count 11, the trial court sentenced James to a concurrent term of two years. For his conviction of possession of a firearm by a felon in violation of section 29800, subdivision (a)(1), the crime for which he had been released on bail when he committed the robberies and attempted robbery, the court imposed a consecutive term of eight months.

As to the enhancements, for James's personal use of a handgun during the robberies and attempted robbery within the meaning of section 12022.53, subdivision (b), the trial court imposed a term of 10 years with regard to count 2, a term of one-third the midterm, or three years four months with regard to count 1, a term of three years four months with regard to count 3, a term of 10 years with regard to count 4, a term of three years four months with regard to count 5, a term of 10 years with regard to count 6, a term of three years four months with regard to count 7, a term of 10 years with regard to count 8, a term of 10 years with regard to count 9, a term of three years four months with regard to count 10 and a term of 10 years with regard to count 11. The trial court then ran the terms imposed for counts 4, 6, 8, 9 and 11 concurrently.

For the finding James committed the robberies and attempted robbery while released on bail pursuant to section 12022.1, the trial court imposed a term of two years with regard to the robbery alleged in count 2.[7] As to the remaining counts, the court stayed imposition of sentence pursuant to section 654.[8] Punishment for the finding with

---

[7] At the same proceedings, the trial court imposed a sentence of eight months for James's conviction of possession of a firearm by a felon (§ 29800, subd. (a)(1)), the offense for which he had been out on bail when he committed the robberies and attempted robbery.

[8] Section 654 provides in relevant part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that

regard to each of the 11 counts that a principal had been armed with a firearm pursuant to section 12022, subdivision (a)(1) was stricken pursuant to section 1385, subdivision (a).[9] The trial court found that "imposition of the 10 year gun use enhancement [was] punishment enough for the conduct involved." For his conviction of the three offenses for which he served prison terms pursuant to section 667.5, subdivision (b), the trial court imposed a total of three years in prison. Finally, the trial court determined James's sentence was to be served in state prison pursuant to sections 1170, subdivision (a), 1170.1, subdivision (a) and 1170, subdivision (h)(3). In total, the trial court sentenced James to 40 years 4 months in state prison.

The court ordered James to pay $560 in restitution fines (§ 1202.4, subd. (b)), a suspended $560 parole revocation restitution fine (§ 1202.45), a $10 fine because he was convicted of several counts of robbery (§ 1202.5), a $480 court operations assessment (§ 1465.8, subd. (a)), a $ 360 conviction assessment (Gov. Code, § 70373) and restitution to the victims, the amount of which was to be determined at a later proceeding. The court awarded James presentence custody credit for 940 days actually served and 140 days of good time/work time, or a total of 1,080 days for both the case in which he unlawfully possessed a firearm and the matter in which he was found to have committed the robberies and attempted robbery. James filed a timely notice of appeal from the case in which he was convicted of the robberies and attempted robbery on February 3, 2014. He filed a request for a certificate of probable cause on February 21, 2014. The trial court denied the request for a certificate of probable cause on February 21, 2014.

---

provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

[9] Section 1385, subdivision (a) provides in relevant part: "The judge . . . may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed."

**CONTENTIONS**

After examination of the record, counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed June 17, 2014, the clerk of this court advised James to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

**REVIEW ON APPEAL**

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

**DISPOSITION**

The judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



KLEIN, P. J.


We concur:


KITCHING, J.



ALDRICH, J.


10